UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROLAND BENSON,

                    Plaintiff,

        -against-

WESTCHESTER MEDICAL CENTER, et al.,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**

20-CV-05076 (PMH)

---

PHILIP M. HALPERN, United States District Judge:

Roland Benson ("Plaintiff") brings this action against: (1) Westchester Medical Center ("WMC"); (2) Westchester Medical Center Health Network ("WMCHN"); and (3) Jill DelBello ("DelBello," and collectively, "Defendants"). (Doc. 23, "SAC").[1] The Second Amended Complaint—the operative pleading, spanning 54 pages and more than 162 paragraphs—presses nine claims for relief under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and New York State common law against one or more Defendants, alleging specifically: (1) FMLA interference; (2) FMLA retaliation; (3) ADA discrimination; (4) ADA retaliation; (5) NYSHRL discrimination; (6) Rehabilitation Act discrimination; (7) Rehabilitation Act retaliation; (8) defamation; and (9) *prima facie* tort.[2] (*See* SAC ¶¶ 111-62).

---

[1] The Second Amended Complaint and its exhibits are filed as separate docket entries (*i.e.*, Doc. 23 and Doc. 24). For ease of reference, when referring to the pleading's exhibits, the Court cites to "SAC, Ex. __."

[2] This recitation of the claims for relief relies upon Plaintiff's characterization thereof. (*See* SAC ¶¶ 111-62). As explained more fully *infra*, however, some of these claims for relief contain more than one "theory" of recovery (i.e., discrimination, failure to accommodate, and hostile work environment).

Defendants served a motion to dismiss this action in its entirety under Federal Rule of Civil Procedure 12(b)(6) on July 16, 2021. (Doc. 36; Doc. 37; Doc. 38, "Def. Br."). Plaintiff served his opposition papers on August 17, 2021 (Doc. 43, "Opp. Br."), and the matter was briefed fully with the service of Defendants' reply memorandum of law in further support of their motion on August 30, 2021 (Doc. 41, "Reply Br.").

For the reasons set forth below, Defendants' motion is GRANTED IN PART.

## BACKGROUND

I.    Plaintiff's Asthma

Plaintiff suffers from "chronic asthma and allergies with acute exacerbations, which substantially limits his breathing daily . . . ." (SAC ¶ 5). He has been treated for this condition for over three decades. (*Id*. ¶ 20). The "daily breathing limitations . . . include[,] but [are] not limited to, tightness in the chest, wheezing, coughing, difficulty breathing and if the exacerbation is severe, difficulty talking and walking." (*Id*.). Such "flare-ups" have hospitalized Plaintiff on five occasions and "have intermittently made him unable to work." (*Id*.).

II.    Plaintiff's Employment at WMC

Plaintiff's tenure at WMC lasted "for approximately 1.5 years . . . ." (*Id*. ¶ 1).

A.    October 2018-June 10, 2019[3]

Plaintiff began his nursing career at WMC, a hospital within the WMCHN, in October 2018. (*Id*. ¶¶ 19, 23). Plaintiff was first assigned to the operating room for orientation and a course of training which could last up to ten months (i.e., August 2019). (*Id*. ¶ 23). Approximately six months into that assignment, in April 2019, Plaintiff requested a meeting with Vice President of

---

[3] Given the Second Amended Complaint's density, for ease of reference and understanding, recitation of the facts pled is divided into time periods separated by natural breaks.

Perioperative Services Barbara Teich ("Teich"). (*Id*. ¶ 25). Plaintiff sought that meeting because, notwithstanding his success in his initial assignment, he was concerned about "inconsistencies in training" and "being put in procedural situations for which he had not yet been trained." (*Id*. ¶¶ 24-25). Plaintiff met with Teich and, during that meeting, the two discussed an expected job opening for a nurse in WMC's Endoscopy Unit. (*Id*.). The anticipated position opened up, Plaintiff applied, and he was hired. (*Id*. ¶ 28).

      B.  <u>June 11, 2019-October 31, 2019</u>

     Plaintiff began his Endoscopy Unit assignment, under DelBello's management, on June 11, 2019. (*Id*. ¶ 29). During Plaintiff's orientation (presumably that day), he and Diane Noone ("Noone") asked that DelBello: (1) procure a larger lead apron for Plaintiff, as those available were too small; and (2) issue Plaintiff a dosimeter (an instrument used to measure radiation). (*Id*. ¶ 29). Neither was provided that day.

     Plaintiff missed work intermittently over the summer. Approximately one month after orientation, on July 12, 2019, he called out sick due to an asthma attack. (*Id*. ¶ 30). On August 6, 2019, he missed work for a dental appointment.[4] (*Id*. ¶ 31). Roughly two weeks after that, on August 19, 2019, Plaintiff called out again because of an asthma attack. (*Id*. ¶ 30). Approximately two weeks after that absence, on August 30, 2019, Plaintiff had his Orientation Performance and Goals review meeting with Director of Perioperative Services Pam Germinaro ("Germinaro"), DelBello, and Noone. (*Id*. ¶ 32).

     Notwithstanding Plaintiff's absences, the August 30, 2019 review was generally positive. (*Id*.). Germinaro advised, however, that "[s]ick calls and time attendance needs to be

---

[4] Plaintiff alleges that he had to take the entire day off for his dental appointment because DelBello told him that he had to do so. (SAC ¶ 31). Plaintiff submitted a note from his dentist the next day. (*Id*.).

improved/decreased." (*Id*.). Plaintiff asked that his July 12, 2019 and August 19, 2019 absences not be held "against him . . . ." (*Id*. ¶ 33). He received no response to that request. (*Id*.).

The two months after the August 30, 2019 review were uneventful. Plaintiff had no attacks that impacted his ability to perform his job and, at some point in September 2019, he received an evaluation giving him "all positive marks" across some twenty pages of criteria. (*Id*. ¶¶ 34-35).

### C.  November 1, 2019-January 7, 2020

Plaintiff had an asthma attack about halfway through the workday on November 1, 2019. (*Id*. ¶ 36). Plaintiff notified DelBello who, although "appear[ing] to be annoyed and roll[ing] her eyes," told him, "[i]f you need to leave[,] then leave." (*Id*.). Plaintiff left work and saw his physician who, *inter alia*, diagnosed him with bronchitis and prescribed antibiotics. (*Id*.). Although Plaintiff submitted a doctor's note after the fact, "the hours taken [on November 1, 2019] . . . were recorded as . . . unexcused . . . ." (*Id*. (internal quotation marks omitted)).

Asthma attacks kept Plaintiff out of work again on December 3, 2019 and December 6, 2019.[5] (*Id*. ¶ 42). On December 6, 2019, DelBello told Plaintiff that he, she, and Germinaro would meet to discuss his ongoing attendance issues. (*Id*. ¶ 43). One week later, on December 13, 2019, Plaintiff had another asthma attack at work, reported it to DelBello, and asked to leave. (*Id*. ¶ 44). DelBello responded, "Are you kidding me, you can't go home today." (*Id*.). DelBello called Germinaro on the spot and told Plaintiff that he could either go to: (1) the emergency room; or (2) the Integrated Disability Office ("IDO"), a subset of WMC's Human Resources Department. (*Id*.). Plaintiff opted for the latter and, at the IDO, spoke with an unidentified person who gave Plaintiff FMLA paperwork and advised "that sick time needed for his asthma should not be held against

---

[5] At some point—presumably between November 1, 2019 and December 3, 2019—Plaintiff discovered that DelBello decreased Plaintiff's "accrued time" on four different days. (SAC ¶ 41). Plaintiff does not explain the significance of this allegation. (*Id*.).

him." (*Id*. ¶ 45). Plaintiff, after that meeting, left to see his doctor. (*Id*.). DelBello, at some point, deleted Plaintiff's time entry for December 13, 2019. (*Id*. ¶ 46).

Plaintiff's physician submitted the FMLA paperwork for intermittent leave between December 16, 2019 and December 15, 2020 to the IDO on December 16, 2019 and, that same day, Plaintiff brought the original paperwork to DelBello. (*Id*. ¶¶ 47-48, 54). The FMLA submission included a notation from Plaintiff's doctor that, in addition to asthma, Plaintiff "suffers from neck and mid-back pain requiring chiropractic treatment and manipulation once per month . . . ." (*Id*. ¶ 50). Plaintiff, at DelBello's direction, took the FMLA paperwork to Germinaro. (*Id*. ¶¶ 48, 50). During that interaction with Plaintiff, Germinaro explained that she had contacted WMC's legal department and the IDO to figure out how to "move forward." (*Id*. ¶ 51(b)). Germinaro expressed confusion about Plaintiff's FMLA request, observing, "[I]t's kind of hard if you're saying you are cleared, but then you're saying you're not really cleared because you need time off for [your asthma] sometimes." (*Id*. ¶ 51(c)). Germinaro mused further, "I have asthma, I've never missed a day at work from asthma and we don't have light duty in this facility." (*Id*. ¶ 51(e)).

The FMLA request was approved on December 20, 2019. (*Id*. ¶ 54; *see also id*., Ex. C).

From December 16, 2019—the day Plaintiff submitted his FMLA request—through December 23, 2019, DelBello increased Plaintiff's assigned Endoscopic Retrograde Cholangiopancreatography ("ERCP") procedures from approximately one per week to one or two daily. (*Id*. ¶ 52). Plaintiff insists that during this time, notwithstanding his exposure to radiation, DelBello refused to provide him with a larger lead apron or a dosimeter. (*Id*.).

While Plaintiff undertook his increased workload, on December 18, 2019, Germinaro, DelBello, and a union representative held a meeting. (*Id*. ¶ 56). Plaintiff, following that meeting,

was disciplined and given a written reprimand for three unexcused absences. (*Id*.).[6]

Two days after that, on December 20, 2019, Plaintiff overheard DelBello tell a new surgeon that the latter would be measured for a lead apron. (*Id*. ¶ 57). Plaintiff interrupted the conversation to ask if he could be measured as well, but DelBello refused, stating, "I already told you . . . that if you need a custom fit apron you need to buy it yourself." (*Id*.). Later that day, Plaintiff consulted with a union representative who told him to draft an e-mail to DelBello documenting her behavior and "create a paper trail . . . ." (*Id*. ¶ 58). Plaintiff drafted the message, reviewed it with his representative on December 22, 2019, and sent it to DelBello on December 23, 2019. (*Id*. ¶¶ 59-60). DelBello responded, in pertinent part, as follows:

> Since this is the FIRST time you mentioned to me the lead doesn't fit you, (you've been here 6 months, it's a holiday week and the end of the year) it will take me a little time to obtain additional PPE that will fit your needs. I have told you in the past your radiation badge is up in the Main OR, go upstairs and get it . . . .

(*Id*. ¶ 60). DelBello wrote further, "I did (notice past tense) suggest that in the meantime, until I can get things approved, to check in the OR to see if Ken has XXL sizes available for you to use if our XL lead doesn't fit. Since you won't do that, personal custom lead is at your own cost." (*Id*.).

About one hour later, DelBello wrote Plaintiff another e-mail: (1) advising that she received an apron from the operating room which was too small; and (2) directing Plaintiff to get his dosimeter in the main operating room. (*Id*. ¶ 61). Plaintiff went to the operating room, but there was no dosimeter there for him. (*Id*.).

At some point that day (Plaintiff does not specify when): (1) Plaintiff learned that DelBello offered all staff except him the option to come in and leave early on December 24, 2019; (2) DelBello reassigned him to handle an ERCP scheduled for 5:20 p.m. on December 23, 2019; (3)

---

[6] That reprimand included November 1, 2019, but Plaintiff does not identify the other dates. (SAC ¶ 56).

he completed a Protest of Assignment and Incident Report complaining that he did not have a proper lead apron or dosimeter; (4) DelBello assigned only him to cover post-operation recovery after the 5:20 p.m. ERCP; and (5) DelBello refused to classify the 5:20 p.m. assignment as a "mandation" under the governing union contract. (*Id*. ¶¶ 62-65).[7]

The next day, December 24, 2019—Christmas Eve—Plaintiff met with Teich regarding his Protest of Assignment and Incident Report. (*Id*. ¶ 67). Teich advised Plaintiff that DelBello gets "defensive" when employees go to their union, was responsible for procuring the apron and dosimeter, and "needs to learn the right way." (*Id*. ¶¶ 67(a)-(c)). Plaintiff returned to the Endoscopy Unit after the meeting. (*Id*. ¶ 68). Upon his return, DelBello informed Plaintiff that his dosimeter had been available and waiting for him in the Endoscopy Unit since August 2019. (*Id*.). DelBello also introduced Plaintiff to WMC's Radiation Safety Officer, Matty Mozzor ("Mozzor"), who— according to DelBello—handed out dosimeters. (*Id*. ¶ 69). Plaintiff complained about needing a lead apron and, in the exchange that followed, DelBello alluded to Plaintiff's request for a mandate and said, "Maybe we need a schedule change and I'll start with you." (*Id*. ¶ 71).

DelBello left work around 2:30 p.m. on December 24, 2019, after giving all staff except Plaintiff a bottle of champagne. (*Id*. ¶¶ 66, 71). The Charge Nurse, Kathleen Wren ("Wren")—the person to whom Plaintiff answered when DelBello left that day—gave Plaintiff permission to leave with the rest of the staff. (*Id*. ¶¶ 71-72). Three days later, December 27, 2019, DelBello confronted Plaintiff about leaving early on Christmas Eve. Plaintiff argued that Wren gave him permission to do so; DelBello countered that only "leadership" could allow him to leave early. (*Id*. ¶ 73). At some point that same day, Plaintiff received his Annual Performance Evaluation. (*Id*. ¶ 74). The

---

[7] Plaintiff explains that "[p]ursuant to the Union Contract, this would be considered an involuntary mandation and after 3 mandations, Plaintiff would be entitled to double time." (SAC ¶ 65).

document, created by DelBello on December 18, 2019, gave him negative marks in every category. (*Id*.). DelBello nonetheless continued scheduling Plaintiff as the only nurse on duty. (*Id*. ¶ 75).

Plaintiff was out of work on FMLA leave on December 30, 2019 and December 31, 2019. (*Id*. ¶ 76). Although Plaintiff tried to return to work on his next scheduled workday, January 3, 2020, DelBello refused to allow him to return without a doctor's note. (*Id*. ¶ 78).

### D. January 8, 2020-January 20, 2020

Plaintiff returned to work, after submitting a doctor's note, on January 8, 2020. (*Id*. ¶ 79). At some point that day, DelBello complimented Plaintiff's coworker, but not him. (*Id*. ¶ 80). After Plaintiff's shift on January 8, 2020, DelBello advised Plaintiff that there would be a meeting on January 9, 2020 to discuss changing his shift from 9:00 a.m. to 7:00 p.m. to 10:00 a.m. to 8:00 p.m. (*Id*. ¶¶ 62, 81). The meeting would involve DelBello, Germinaro, Plaintiff, a representative from WMC's Human Resources Department, and two union representatives. (*Id*.).

During the January 9, 2020 meeting DelBello: (1) lied, stating that no other staff member wanted the shift; and (2) instructed that any request to come into or leave work early would have to be approved in writing. (*Id*. ¶¶ 82-83). At some point that day, Plaintiff met with Mozzor about his lead apron and tried aprons on in front of both Mozzor and DelBello. (*Id*. ¶ 85). Mozzor agreed that Plaintiff needed a larger lead apron and gave Plaintiff his first radiation safety training. (*Id*. ¶¶ 85-86). DelBello had Plaintiff fitted for a lead apron the next day, January 10, 2020. (*Id*. ¶ 89). That interaction between DelBello and Plaintiff began with a dispute about whether Plaintiff could choose the apron's color and style and ended with an asthma attack. (*Id*.). DelBello refused to let Plaintiff leave, texted Germinaro, walked to her office with Plaintiff in tow, shut her office door, and yelled through the door, "Don't leave, you can't leave." (*Id*. ¶ 90). Plaintiff, without any further word, left approximately seven minutes later and sought medical attention. (*Id*. ¶¶ 90-91).

Plaintiff's doctor advised that he remain out of work from January 13, 2020 until January 20, 2020 due to his asthma, and faxed a letter to the IDO stating same. (*Id.* ¶ 95). When Plaintiff left his doctor's office on January 13, 2020, he had two voicemails from Germinaro. (*Id.* ¶ 96). In one message, Germinaro stated, "Do not come in the rest of the week and you will be hearing from HR." (*Id.*). In another, she advised, "to be clear this week is to be counted as a suspension without pay . . . ." (*Id.*). Plaintiff was never told why he was suspended. (*Id.*).

     E. <u>January 21, 2020-July 2, 2020</u>

Approximately three weeks after the suspension, on February 8, 2020, Plaintiff was suspended without pay between February 6, 2020 and February 11, 2020 for time and attendance violations. (*Id.* ¶ 97). Specifically, a letter that Plaintiff received explained that he was suspended:

> for failing to meet the time and attendance standards of your position. More specifically, on December 18, 2019, you received a written reprimand for time and attendance. Then, on December 24, 2019, you left your shift early without authorization from your manager or director.

(*Id.*). Sometime between February 11, 2020 and July 2, 2020 (i.e., the day this matter was first filed), Plaintiff's employment relationship with Defendants ceased. (*See id.* ¶¶ 5, 33, 36, 97, 118).[8]

III.  <u>Administrative Investigations at WMC</u>

Plaintiff does not plead specifically the administrative bodies involved, but he pleads facts suggesting that Defendants participated in investigations performed by both the New York State Department of Health ("NYSDOH") and the Occupational Safety and Health Administration ("OSHA"). (*Id.* ¶¶ 99-107).

In connection with one investigation, Plaintiff says that Kukowski sent e-mails to "an

---

[8] Plaintiff avers that the FMLA request paperwork was altered without his knowledge to extend his leave. (SAC ¶ 98). Plaintiff does not explain what bearing this allegation has on has on any claim for relief.

administrative agency" showing that DelBello, Patient Service Representative Debbie Castleberry, and Brad Dworkin, MD, "conspired and made false statements via email to Germinaro in attempt to cause [Plaintiff] harm." (*Id*. ¶ 99). These messages, according to Plaintiff, contain "complete lies" and are belied by unidentified recordings. (*Id*.). Specifically, Plaintiff pled that falsehoods were "formally presented to Government agencies to malign, discredit, and harm Plaintiff." (*Id*.). As Plaintiff pled:

> Kukowski falsely said in an email to OSHA "He performed poorly in the Operation room," and that Mr. Benson was provided a radiation badge during ERCP's." Kukowski falsely reported that Mr. Benson has a pattern of Friday sick calls." Kukowski falsely reported to OSHA that "Prior to receiving Mr. Benson's OSHA complaint, WMC was seriously contemplating terminating Mr. Benson's employment. The reason is violations of workplace violence policy."

(*Id*. (original alteration omitted)). Plaintiff complains further that Kukowski told "an administrative agency" that: (1) he had a "short and rocky employment" with examples of workplace violence; and (2) that DelBello had a confrontation with him in which she "felt threatened and intimidated by Plaintiff . . . a large man who had DelBello cornered." (*Id*. ¶¶ 105-06 (internal quotation marks omitted)).

In a separate vein, on January 27, 2020, the NYSDOH conducted an unannounced visit at WMC to investigate the facility's compliance with various requirements. (*Id*. ¶ 101). The investigation was triggered by "an employee complaint regarding radiation-producing equipment safety . . . ." (*Id*., Ex. F at 1). The NYSDOH issued a letter on June 17, 2020 noting that "certain of [WMC's] activities appeared to be in violation . . . [or] raise questions about safety of operations." (*Id*.). Plaintiff insists that Kukowski lied to "an administrative agency" when she said that "NYSDOH investigators said[] they had no recommendations for improvements." (*Id*. ¶ 104).

This litigation followed.

**STANDARD OF REVIEW**

I.    Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion enables a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). The factual allegations pled "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the Court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678 (alteration in original)). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

II.   Documents Considered on a Motion to Dismiss

On a Rule 12(b)(6) motion, "the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014); *Manley v. Utzinger*, No. 10-CV-02210, 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) ("The Court may consider . . . documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which plaintiff relied in bringing the suit."). Still, even if a document is not incorporated into the complaint by reference, the Court may consider it "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)); *see also Schafer v. Direct Energy Servs., LLC*, 845 F. App'x 81, 82 (2d Cir. 2021) ("Where an extrinsic document is not incorporated by reference, the district court may nevertheless consider it if the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks omitted)).

All parties submitted extraneous documents for the Court's consideration on this motion.

Defendants submitted two extraneous documents: (1) the Notice of Claim that Plaintiff served on Defendants before initiating this proceeding (Doc. 37-2, "Not. of Claim"); and (2) a May 12, 2020 letter addressed to OSHA and signed by Barbara F. Kukowski. (Doc. 37-3, "OSHA

12

Resp.").[9] Both documents may be properly considered at this juncture. With respect to the former, as discussed *infra*, filing the Notice of Claim was a precondition to filing tort claims against Defendants—that document is, therefore, integral to the Second Amended Complaint. *See Karlyg v. Merino*, No. 20-CV-00991, 2021 WL 4222450, at *8 n.10 (E.D.N.Y. Sept. 15, 2021); *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-01790, 2020 WL 2131771, at *13 n.5 (S.D.N.Y. May 4, 2020); *Lipford v. City of Rochester*, No. 16-CV-06266, 2017 WL 4344633, at *3 (W.D.N.Y. Sept. 29, 2017); *Hazan v. City of New York*, No. 98-CV-01716, 1999 WL 493352, at *6 (S.D.N.Y. July 12, 1999). As to the latter, it is quoted in the Second Amended Complaint and serves as the entire basis of Plaintiff's defamation claim. (SAC ¶ 151). That document is, therefore, appropriately considered on this motion. *See Moraes v. White*, No. 21-CV-04743, 2021 WL 5450604, at *8 (S.D.N.Y. Nov. 22, 2021); *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 220 (E.D.N.Y. 2020); *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) ("These submissions are the records of the allegedly slanderous statements made by defendant. They aid the Court in its determination of whether plaintiff states a claim for relief, and by including them in its considerations the Court creates no unfairness to either party.").

Plaintiff submitted a fifty-five page document purporting to be a contract between the New York State Nurses Association and the Westchester County Heath Care Corporation. (Doc. 43-1).

---

[9] These extraneous documents were submitted as attachments to the Declaration of Barbara Kukowski, Senior Vice President and Deputy General Counsel at Westchester County Heath Care Corporation, the public benefit corporation doing business as WMCHN. (*See* Doc. 37 ¶¶ 1-2). The Court notes that this document contains substantive legal arguments. (*See, e.g.*, *id.* ¶ 7 ("Plaintiff has failed to seek leave of court permitting late service . . . meaning that his NYSHRL discrimination claim and *prima facie* tort claim . . . must be dismissed as a matter of law.")). To the extent such arguments exist, they are disregarded because they are advanced improperly in a declaration. *See Booker v. E.T. Browne Drug Co.*, No. 20-CV-03166, 2021 WL 4340489, at *1 n.1 (S.D.N.Y. Sept. 23, 2021) ("First of all, this document contains substantive legal arguments that belong in the memorandum of law under Local Civil Rule 7.1(a)(2) . . . this document appears to be a thinly-veiled attempt to circumvent Rule 4.H of this Court's Individual Practices, which limits moving memoranda of law to twenty-five pages.").

"[T]he Court declines to consider this extraneous document because it is annexed improperly as an exhibit to [Plaintiff's] memorandum of law instead of an affidavit, in violation of Local Civil Rule 7.1(a)(3)." *Tescher v. Experian Info. Sols., Inc.*, No. 21-CV-02266, 2022 WL 564048, at *4 (S.D.N.Y. Feb. 23, 2022); *see also Walsh v. Caliber Home Loans, Inc.*, No. 19-CV-08966, 2021 WL 124684, at *1 (S.D.N.Y. Jan. 13, 2021). Even if this Court were to overlook the procedurally defective way in which this hearsay document was submitted—and it does not do so—the pleading's only reference to a union contract is in the context of explaining "mandations." (SAC ¶ 65). Indeed, while Plaintiff references union representatives, he never once identifies his union or the agreement he claims governs his employment. (*See generally id.*). The agreement is not integral to the pleading and will not be considered at this juncture. *Cf. Correa v. Lynch*, No. 20-CV-02875, 2021 WL 2036697, at *4 (S.D.N.Y. May 20, 2021) (concluding that the *pro se* plaintiff's representation that he complied with administrative exhaustion requirements in the abstract did not render grievances integral to the pleading).[10]

## ANALYSIS

Defendants seek dismissal all nine claims for relief. The Court considers the claims for relief *seriatim* and, where appropriate, more than one claim for relief at a time.

I.   The FMLA Claims for Relief

The first two claims for relief proceed under the FMLA. Generally, the FMLA is meant "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity"

---

[10] The Court notes further that Plaintiff's opposition brief contains various citations to items not properly before the Court. (*See* Opp. Br. at 6 (insisting that "[t]he record is replete with instances to show that Plaintiff's disability was routinely minimized" and quoting audio recordings)). Such arguments have no place in a motion to dismiss and are, accordingly, disregarded.

and "to entitle employees to take reasonable leave for medical reasons . . . ." 29 U.S.C. § 2601(b)(1)-(2). To this end, "the FMLA makes it illegal for employers to: (1) 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right' provided under the FMLA; or (2) 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA." *Prout v. Vladeck*, 316 F. Supp. 3d 784, 800 (S.D.N.Y. 2018) (quoting 29 U.S.C. § 2615(a)). There are two types of private claims for relief under the FMLA interference and retaliation claims. *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011) (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)).

A. <u>FMLA Interference</u>

An FMLA interference claim requires that Plaintiff plead: "(1) that he is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that he was entitled to leave under FMLA; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which he was entitled under the FMLA." *Id.* at 465 (citing *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)); *see also Ziccarelli v. NYU Hosps. Ctr.*, 247 F. Supp. 3d 438, 447 (S.D.N.Y. 2017). Defendants argue that this claim must be dismissed because Plaintiff has not pled that he was "denied benefits to which he was entitled under the FMLA." (Def. Br. at 9). Plaintiff counters that Defendants failed to affirmatively inform him that his absences may be covered by the FMLA. (Opp. Br. at 11-15).[11]

---

[11] Plaintiff's opposition brief, on this point, weaves other concepts into the argument. Plaintiff, for example, argues that requesting his absences not be classified as "unexcused" was a request for a reasonable accommodation under the ADA. (Opp. Br. at 12). The ADA, however, is a different statute. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Slade v. Alfred Univ.*, No. 11-CV-00396, 2013 WL 6081710, at *14 (W.D.N.Y. Nov. 19, 2013) (internal quotation marks omitted).

The FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Although the word "interfere" is not defined in the FMLA itself, regulations enacted by the U.S. Department of Labor ("DOL") provide further guidance. *See* 29 U.S.C. § 2654 (granting the U.S. Secretary of Labor authority to "prescribe such regulations as are necessary to carry out" specific subchapters). Pertinent to Plaintiff's theory of liability, the DOL instructs that "[w]hen an employee requests FMLA leave, *or when the employer acquires knowledge* that an employee's leave *may* be for an FMLA-qualifying reason, *the employer must* notify the employee of . . . eligibility to take FMLA leave . . . ." 29 C.F.R. § 825.300(b)(1) (emphasis added); *see also Coutard v. Mun. Credit Union*, 848 F.3d 102, 107 (2d Cir. 2017) (explaining that an employer's obligation to notify an employee about the potential applicability of FMLA exists, *inter alia*, "when the employer acquires knowledge that an employee's leave *may be for an FMLA-qualifying reason*" (quoting 29 C.F.R. § 825.300(b)(1) (emphasis in original)); *McKenzie v. Erie Cty. Med. Ctr. Corp.*, No. 17-CV-00647, 2019 WL 5695945, at *3 (W.D.N.Y. Nov. 4, 2019); *Cinelli v. Oppenheim-Ephratah Cent. Sch. Dist.*, No. 07-CV-00235, 2009 WL 4724670, at *6 (N.D.N.Y. Dec. 2, 2009).[12] This particular claim for relief proceeds, therefore, on the notion that Defendants interfered with Plaintiff's rights by failing to advise him that he may qualify for FMLA protection.

---

[12] Defendants suggest, citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999), that only failure to post a summary notice exposes an employer to liability under the FMLA. (Reply Br. at 3-4). The decision in *Sarno* did not, however, reach such a conclusion. Rather, the Second Circuit in that case observed, "[a]ssuming *arguendo* that Sarno should have been given more explicit notice than was given (we note that the Act itself provides only for the posting of summary notices, *see* 29 U.S.C. § 2619(a), and that the additional notice provisions set out in the regulations are highly ambiguous, *see* 29 C.F.R. §§ 825.301(a)(1), (a)(2), (b)(1)(i)-(viii), and (b)(2)), Sarno's right to reinstatement could not have been impeded or affected by the lack of notice . . . ." *Sarno*, 183 F.3d at 161. Importantly, the "ambiguous" regulations referenced by the Second Circuit in *Sarno* have been modified in the intervening decades and are no longer the regulations under which courts construe such a failure to notify claim.

The question, then, is whether the failure to advise Plaintiff that his six pre-FMLA request absences (i.e., July 12, 2019, August 19, 2019, November 1, 2019, December 3, 2019, December 6, 2019, and December 13, 2019) may be covered by the statute denied Plaintiff of his rights thereunder. *See Craig v. Univ. of Conn. Health Ctr.*, No. 13-CV-00281, 2016 WL 4536440, at *5 (D. Conn. Aug. 30, 2016) ("Crucial to establishing this type of failure to advise FMLA claim is showing that an employee was prejudiced by the employer's failure to advise her of her rights." (internal quotation marks omitted)). Defendants insist that Plaintiff was not deprived of his FMLA rights because he ultimately received at least five months of FMLA leave (i.e., roughly eight weeks more than the statute requires). (Reply Br. at 4; *see also* SAC ¶ 98). The point is logical and well-taken. There are, however, two issues preventing dismissal of this claim for relief.

First, Defendants have not presented—and the Court has not found—precedent in which a court dismissed an FMLA interference claim because the plaintiff ultimately received more FMLA leave than required on similar facts. *See Ziccarelli v. NYU Hosps. Ctr.*, No. 15-CV-09307, 2021 WL 797668, at *5 (S.D.N.Y. Feb. 27, 2021) ("[I]t is not true that there is no prejudice to the employee so long as an employer makes up for its interference by providing additional leave at a later time." (internal citation omitted)). Second, it is plausible that, had Plaintiff been advised that his absences might fall under the FMLA, he would have been able to structure his leave in a way to avoid suspension without pay for time and attendance issues. (*See* Opp. Br. at 14); *see also Rengan v. FX Direct Dealer, LLC*, No. 15-CV-04137, 2017 WL 3382074, at *9 (S.D.N.Y. Aug. 4, 2017) (concluding, at summary judgment, that issues of material fact remained as to whether notices "allowed the plaintiff to make an informed decision to structure her leave in a manner that would ensure her successful return to work"); *Blackett v. Whole Foods Mkt. Grp., Inc.*, No. 14-CV-01896, 2017 WL 1138126, at *7 (D. Conn. Mar. 27, 2017) (observing, at summary judgment,

that "[g]iven the number of times defendant failed to provide required notices to plaintiff, plaintiff might have structured his leaves differently any number of times, but lost the opportunity to do so"). Defendants may revisit these issues after discovery.

Plaintiff has stated a plausible claim for FMLA interference based upon the failure to notify him that his leave may be covered under the FMLA.

B.  FMLA Retaliation

An FMLA retaliation claim requires Plaintiff to "demonstrate [that]: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Kastrati v. Progress of Peoples Mgmt. Corp.*, No. 18-CV-06731, 2020 WL 6940991, at *5 (E.D.N.Y. Nov. 24, 2020) (citing *Potenza*, 365 F.3d at 168). This claim is, like other anti-discrimination claims for relief, "analyzed under the *McDonnell Douglas* three-step burden shifting framework." *Alexander v. Bd. of Educ. of City Sch. Dist. of City of New York*, 107 F. Supp. 3d 323, 328 (S.D.N.Y. 2015), *aff'd sub nom. Alexander v. Bd. of Educ. of City of New York*, 648 F. App'x 118 (2d Cir. 2016).

Defendants, on this claim, take issue only with causation—they insist that Plaintiff has not pled causation between exercising a protected right and an adverse employment action. (Def. Br. at 11-12). Plaintiff, however, "can plead an inference of retaliatory intent by demonstrating temporal proximity between [his] protected activity and the adverse action by the employer." *Fukelman v. Delta Air Lines, Inc.*, No. 18-CV-00002, 2020 WL 4587496, at *19 (E.D.N.Y. Apr. 13, 2020), *adopted by* 2020 WL 2781662 (E.D.N.Y. May 29, 2020). The inference dissipates at the two month-mark. *See, e.g.*, *Crosby v. McDonald's of Guilderland, LLC*, No. 17-CV-01160, 2018 WL 2077884, at *6 (N.D.N.Y. May 2, 2018) ("District courts have generally found . . . that

'a passage of two months between the protected activity and the adverse employment action seems to be the dividing line.'" (quoting *Ruhling v. Tribune Co.*, No. 04-CV-02430, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007)); *McFarlane v. Chao*, No. 04-CV-04871, 2007 WL 1017604, at *24 (S.D.N.Y. Mar. 30, 2007). Here, notwithstanding any other adverse employment action, Plaintiff was suspended without pay for a week on January 13, 2020 (i.e., less than a month after submitting his FMLA request). (SAC ¶¶ 95-96). Plaintiff has, therefore, pled *prima facie* causation. *Cf. Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (concluding that being suspended without pay for one week was an adverse employment action for an ADA retaliation claim); *Page v. Conn. Dep't of Pub. Safety, Div. of State Police*, 185 F. Supp. 2d 149, 157 (D. Conn. 2002) (observing, in Title VII retaliation context, that "[i]n this Circuit, suspension without pay constitutes adverse employment action").

Defendants, in reply, ask this Court to adjudge both their nondiscriminatory reasons and the lack of pretext. (Reply Br. at 7-10). That, this Court will not do on a motion to dismiss. "Defendant[s] will be free to dispute the veracity of what occurred at a later stage, but on the face of the pleadings, [Plaintiff] has adequately pled a causal connection . . . ." *Katz v. Equinox Holdings, Inc.*, No. 20-CV-09856, 2022 WL 1292262, at *4 (S.D.N.Y. Apr. 29, 2022).

II.   The ADA and Rehabilitation Act Claims for Relief

The third, fourth, sixth, and seventh claims proceed under either the ADA or Rehabilitation Act.[13] (*See* SAC ¶¶ 124-35, 142-49). The Court considers these claims in tandem.

---

[13] The seventh claim for relief is labeled "Rehabilitation Act-Retaliation," but cites the NYSHRL. (SAC ¶¶ 146-49). No party addressed this issue, and all assume that the claim proceeds under the Rehabilitation Act. (*See* Def. Br.; Opp. Br.; Reply Br.). The Court, consequently, operates under this assumption as well.

A.  Discrimination Claims

The third and sixth claims for relief—although generically labeled "discrimination" and concerning the ADA and Rehabilitation Act, respectively—identify, in a blunderbuss, immeasurably confusing pleading style, three separate theories of recovery under this heading: (1) taking adverse employment actions against Plaintiff because of his disability; (2) failing to provide Plaintiff with a reasonable accommodation for his disability; and (3) creating a hostile work environment because of Plaintiff's disability. (SAC ¶¶ 126, 139, 144). The Court addresses each different theory sequentially.

i.  Theory No. 1: Disability Discrimination

A *prima facie* claim for disability discrimination under the ADA requires that Plaintiff plead "that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by [his] employer; (3) [he] was otherwise qualified to perform the essential functions of the job with or without accommodation; (4) [he] suffered an adverse employment action; and (5) the adverse employment action was imposed because of [his] disability." *Daly v. Westchester Cty. Bd. of Legislators*, No. 19-CV-04642, 2021 WL 229672, at *5 (S.D.N.Y. Jan. 22, 2021) (quoting *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (alterations in original)). The Rehabilitation Act requires the same constituent elements, albeit tailored to that statute. *See Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) ("Disability discrimination claims under the Rehabilitation Act and NYSHRL are analyzed under the same standard used for ADA discrimination claims."). Should Plaintiff present a *prima facie* claim for discrimination based upon his disability (i.e., asthma), the claims are then analyzed within the *McDonnell Douglas* framework. *See Clark v. Coca-Cola Beverages Ne., Inc.*, No. 20-4040-CV, 2022 WL 92060, at *2 (2d Cir. Jan. 10, 2022).

20

Both the ADA and Rehabilitation Act require, at the *prima facie* stage, "but-for" causation between an adverse employment action and Plaintiff's disability. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). Plaintiff falls well short of this standard and, in his opposition, offers virtually no explanation as to how the SAC presents a but-for causal connection between his disability and one or more adverse employment actions.[14] (*See* Opp. Br. at 2-8). Indeed, it appears that Plaintiff's point is not that he *was* treated differently because of his disability; rather, the heart of his complaint is that he *was not* treated differently because of his disability (i.e., having absences that would be unexcused for others excused as to him). Over almost six pages, the only responsive argument Plaintiff offers (uncited) is that, "but-for their belief that Plaintiff was not truly disabled and in need of leave, [Defendants] would not have marked [his] absences as unexcused." (*Id*. at 6).[15] Conclusory speculation is insufficient to plead but-for causation under either the ADA or Rehabilitation Act. *See, e.g.*, *Matthews v. CSX Transp., Inc.*, No. 17-CV-00448, 2018 WL 5069817, at *6 (N.D.N.Y. Oct. 17, 2018) (dismissing ADA and Rehabilitation Act discrimination claims where the plaintiff alleged in conclusory fashion that his termination "was directly related" to his disability); *McManamon v. Shinseki*, No. 11-CV-07610, 2013 WL 3466863, at *10 (S.D.N.Y. July 10, 2013) (dismissing Rehabilitation Act discrimination claim where the pleading did not "supply facts that make the inference reasonable, as opposed to speculative, that . . . [the] decision . . . was influenced by this . . . disability").

---

[14] The bulk of Plaintiff's argument in this section of his brief relies upon breaches of a union contract, audio recordings, and the "possibility" that the adverse actions were caused by "Plaintiff's continued self-advocacy in exercising his right to reasonable accommodations." (Opp. Br. at 2-8).

[15] This argument, phrased a different way, is that Defendants marked Plaintiff's absences unexcused *because* they did not think he was disabled. It would be impossible, therefore, for Defendants to discriminate against Plaintiff because of his disability.

The third and sixth claims for relief, insofar as they proceed on a theory of disability discrimination, are, therefore, dismissed.

ii.   Theory No. 2: Failure to Accommodate

Turning to the next theory of liability under these two statutes, failure to accommodate, the Second Circuit has held that:

> [t]o establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that "(1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

*Natofsky*, 921 F.3d at 352 (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (first alteration added)). Plaintiff, on this theory, fails to state a claim because the accommodation he sought was not reasonable.

The "reasonable accommodation" Plaintiff sought was to have any absences caused by his asthma "excused." (*See* SAC ¶¶ 33, 36, 56, 67, 83). Plaintiff, in his opposition brief, stated affirmatively that the accommodation he sought was "to make sure his sick days were not being counted as unexcused absences that could be held against him." (Opp. Br. at 8). That is not a "reasonable accommodation" under the ADA or Rehabilitation Act and, in fact, suggests that Plaintiff cannot perform the essential functions of his job. *See, e.g.*, *Dotson v. City of Syracuse*, No. 18-CV-00750, 2019 WL 2009076, at *12 (N.D.N.Y. May 7, 2019) (dismissing Rehabilitation Act failure to accommodate claim because the plaintiff "failed to allege that she could perform an essential function of her employment, *i.e.*, showing up for work" (internal quotation marks omitted)); *Lewis v. New York City Police Dep't*, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012)

("Indeed, courts have specifically noted that '[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability.'" (quoting *Mescall v. Marra*, 49 F. Supp. 2d 365, 374 n.18 (S.D.N.Y. 1999)); *Pierce v. Highland Falls-Fort Montgomery Cent. Sch. Dist.*, No. 08-CV-01948, 2011 WL 4526520, at *5 (S.D.N.Y. Sept. 28, 2011) ("The ADA does not require an employer to make a reasonable accommodation for an employee who does not attend work, nor does the Act require an employer to retain such an employee."); *Guardino v. Vill. of Scarsdale Police Dep't*, 815 F. Supp. 2d 643, 648 (S.D.N.Y. 2011) (observing that plaintiff crossing-guard's requested accommodation, "being allowed to leave his post," would eliminate the essential function of coming to work); *Davis v. Bowes*, No. 95-CV-04765, 1997 WL 655935, at *16 (S.D.N.Y. Oct. 20, 1997) ("It is axiomatic that an employee who cannot show up for work cannot perform an essential function of her job." (internal quotation marks omitted)), *aff'd*, 159 F.3d 1346 (2d Cir. 1998); *but see Garcia v. Lewis Tree Serv., Inc.*, No. 21-CV-06393, 2022 WL 717861, at *8 (W.D.N.Y. Mar. 10, 2022) ("[C]ourts considering this question have concluded that *a leave of absence* may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work." (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 186 n.6 (2d Cir. 2006) (emphasis added))).

In short, Plaintiff did not seek a reasonable accommodation under the ADA and Rehabilitation Act. The reasonable accommodation theories undergirding the third and sixth claims for relief are, accordingly, dismissed.

### iii.   Theory No. 3: Hostile Work Environment

The final theory of liability grouped within Plaintiff's ADA and Rehabilitation Act "discrimination" claims is hostile work environment. (SAC ¶¶ 126, 144). Plaintiff, to state such a claim, must plead:

> (1) that the harassment was "sufficiently severe or pervasive to alter
> the conditions of [his] employment and create an abusive working
> environment," and (2) that a specific basis exists for imputing the
> objectionable conduct to the employer."

*Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (quoting *Alfano v. Costello*, 294

F.3d 365, 373 (2d Cir. 2002) (alterations in original)); *see also Voss v. McDonough*, No. 17-CV-

09015, 2021 WL 4199941, at *16 (S.D.N.Y. Sept. 15, 2021) (quoting *Miller v. McHugh*, No. 14-

CV-05026, 2016 WL 698147, at *3 (S.D.N.Y. Feb. 19, 2016)). "The harassing conduct must, of

course, be linked to the 'protected class,'" *Voss*, 2021 WL 4199941, at *16, and it "has both

objective and subjective components: the conduct complained of must be severe or pervasive

enough that a reasonable person would find it hostile or abusive, and the victim must subjectively

perceive the work environment to be abusive." *Modica v. New York City Dep't of Educ.*, No. 20-

CV-04834, 2021 WL 3408587, at *7 (S.D.N.Y. Aug. 4, 2021) (quoting *Raspardo v. Carlone*, 770

F.3d 97, 114 (2d Cir. 2014)). While a single severe incident may suffice, "[a]s a general rule,

incidents must be more than episodic; they must be sufficiently continuous and concerted in order

to be deemed pervasive." *Langella v. Mahopac Cent. Sch. Dist.*, No. 18-CV-10023, 2020 WL

2836760, at *13 (S.D.N.Y. May 31, 2020) (internal quotation marks omitted). The focus is the

totality of the circumstances. *Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist.*, 808 F. App'x

19, 24 (2d Cir. 2020). Such claims "are not intended to promote or enforce civility, gentility or

even decency." *Missick v. City of New York*, 707 F. Supp. 2d 336, 355 (E.D.N.Y. 2010).

   This theory of liability must be dismissed under both statutes for two separate reasons.

   First, Plaintiff has not pled facts sufficiently severe or pervasive enough for a reasonable

person to consider it hostile or abusive. Indeed, in opposition to Defendants' motion on this point,

he offers little more than conclusory arguments invoking the generic nomenclature of this

particular theory. (*See* Opp. Br. at 10-11). The subject conduct is summarized as follows: (1)

consistently being denied an appropriate lead apron and dosimeter from the day Plaintiff started in the Endoscopy Unit; (2) being given a positive performance review with a criticism about time and attendance; (3) having absences counted as "unexcused" despite requests; (4) being reassigned to a different shift and/or more procedures; (5) receiving a written reprimand for absences; (6) being suspended without pay because of his absences; and (7) having supervisors question whether Plaintiff really needed time off. (*See e.g.*, SAC ¶¶ 32-33, 36-37, 44, 55-56, 63-65, 75, 96-97).

Looking to the totality of the circumstances, the incidents Plaintiff identifies do not suggest a work environment that was so permeated with harassment as to alter the terms of his employment. *See, e.g.*, *Brown v. New York City Dep't of Educ.*, No. 20-CV-02424, 2021 WL 4943490, at *12 (S.D.N.Y. Aug. 31, 2021) ("[C]ourts in this Circuit have consistently held that '[a]llegations of even constant reprimands and work criticism by themselves are not sufficient to establish a hostile environment claim'" (quoting *Lucenti v. Potter*, 432 F. Supp. 2d 347, 362 (S.D.N.Y. 2006) (first alteration added)), *adopted by* 2021 WL 4296379 (S.D.N.Y. Sept. 20, 2021); *cf. Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (finding suspension without pay for ten business days insufficient to state hostile work environment claim); *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (allegations that the employer made "negative statements" about plaintiff, was "impatient and used harsh tones with" plaintiff, "wrongfully reprimanded" plaintiff, and spoke to plaintiff sarcastically were not enough for a hostile work environment claim); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) ("[D]efendants wrongly excluded her from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her. These incidents do not support a finding of a hostile work environment . . . ."); *Perez v. New York State Off. of Temp. & Disability Assistance*, No. 14-CV-

01621, 2015 WL 3999311, at *7 (S.D.N.Y. June 30, 2015) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim."); *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 644 (S.D.N.Y. 2011) (concluding that the "laundry list of alleged wrongs," which included reassignment, schedule changes, and increased scrutiny did "not rise to the level of an actionable hostile work environment claim").

Second, even if Plaintiff pled an objectively hostile or abusive working environment, he did not plead causation. Plaintiff offers no non-conclusory allegations connecting the hostile environment to his asthma. This is an alternative basis of dismissal, which the Court adopts. *See, e.g.*, *Zabar v. New York City Dep't of Educ.*, No. 18-CV-06657, 2020 WL 2423450, at *6 (S.D.N.Y. May 12, 2020) ("The absence of factual allegations providing a causal nexus between Plaintiff's disability and the alleged adverse actions is fatal to Plaintiff's hostile work environment claim."); *Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 525 (E.D.N.Y. 2019) ("Sosa has failed to allege that the abusive incidents were because of any disability that she had. This claim, therefore, must be dismissed."); *Moore v. City of New York*, No. 15-CV-06600, 2017 WL 35450, at *22-23 (S.D.N.Y. Jan. 3, 2017), *adopted by* 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017); *Dechberry v. New York City Fire Dep't*, 124 F. Supp. 3d 131, 158 (E.D.N.Y. 2015) ("[T]here is no factual basis upon which to conclude that any of defendant's actions were taken *because of* plaintiff's . . . disability." (emphasis in original)); *see also Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 401 (E.D.N.Y. 2016) (observing that the plaintiff "reversed cause and effect" by claiming that the "harassment triggered her impairments").

The hostile work environment theories under the ADA and Rehabilitation Act are dismissed. As no further theories of liability remain as to the third and sixth claims for relief, they are dismissed in their entirety.

B.  Retaliation Claims

The fourth and seventh claims for relief complain of ADA and Rehabilitation Act retaliation, respectively. (SAC ¶¶ 130-35, 146-49). Plaintiff maintains that he suffered adverse employment actions because he engaged in the protected conduct of "requesting accommodations and complaining of disability discrimination . . . ." (*Id.* ¶ 131; *see also id.* ¶ 148). A retaliation claim requires a plaintiff to plead that: (i) he "was engaged in a protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)). Defendants, on this claim, argue that dismissal is appropriate because Plaintiff failed to plead a causal connection between the adverse employment action and protected activity. (Def. Br. at 15-16). Plaintiff, in his opposition, cites his suspensions. (Opp. Br. at 9).[16] Because Plaintiff clarified that his retaliation claims rely on the suspensions, the question before the Court is whether he pled plausibly that the suspensions were tied to requests for reasonable accommodation and/or complaints about discrimination.[17]

---

[16] Plaintiff first requested that time out of office because of his asthma be excused on August 30, 2019 (i.e., four months and fourteen days before being suspended without pay on January 13, 2020). (SAC ¶¶ 32-33).

[17] Defendants, in moving to dismiss, identified a variety of purported adverse employment actions and argued that Plaintiff failed to plead causation as to any of them. (Def. Br. at 16). Plaintiff's opposition focuses on only one: suspension. (Opp. Br. at 9). As Plaintiff did not address any other theory of adverse employment action in response to Defendants' motion, the Court deems the other theories conceded. *See Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16-CV-07014, 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) ("Numerous courts have held that a plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument."); *In re UBS AG Sec. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (finding that a party "concedes through silence" when it fails to address an argument) (Sullivan, J.), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

Assuming, *arguendo*, that the protected activity was seeking excused absences, Plaintiff began making that request *over four months* before his suspension. (SAC ¶¶ 32-33, 49, 54, 96-97; *see also* Opp. Br. at 9-10 (explaining that Plaintiff was retaliated against by not being allowed to miss work)). That lapse in time is too great to establish causation by temporal proximity alone. *See Shields v. NYC Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 165 (E.D.N.Y. 2020) (finding temporal proximity insufficient where "the alleged protected activities occurred no less than four months before" the protected activity); *Moran v. Wegmans Food Mkts., Inc.*, 65 F. Supp. 3d 327, 332 (W.D.N.Y. 2014) (granting motion to dismiss an ADA retaliation claim, in part, because "the four-month lapse of time between" the protected activity and adverse employment action was "too remote"). Moreover, the letter that Plaintiff's doctor submitted on January 13, 2020 cannot be construed as a *request* for a reasonable accommodation because—although perhaps seeking leave for a finite time—the doctor's note advised Defendants that "Plaintiff *would* be out of work from January 13 to 20, 2020." (SAC ¶ 96 (emphasis added)). As Judge Larimer concluded in a similar situation:

> Moran has not plausibly alleged that he engaged in protected activity. Although Moran characterizes the doctor's note that was faxed to Wegmans on August 7, 2001—stating that Moran would be absent from work for three days—as a "request for an accommodation," the facts alleged in the complaint do not support the conclusion that it was a "request" for anything. Moran alleges only that he left work because he was feeling poorly and needed to see his physician, and didn't return for three days. His actions, as alleged, were entirely unilateral: Wegmans had no opportunity to grant or deny Moran time off as an accommodation, because *Moran never requested it:* he simply "took off" from work, apparently without advising anyone of his intention to do anything other than attend to a doctor's appointment.

*Moran*, 65 F. Supp. 3d at 332 (emphasis in original). This logic is persuasive and equally applicable to the allegations before this Court now.

The fourth and seventh claims for relief, ADA and Rehabilitation Act retaliation, are, consequently, dismissed for Plaintiff's failure to plead a causal connection between a protected activity and his two suspensions without pay.

III.    The State Law Claims for Relief

The final grouping of claims for relief—the fifth, eighth, and ninth claims for relief—advance theories under New York State law. (*See* SAC ¶¶ 136-141, 150-62). The Court considers these claims *seriatim*.

A.    NYSHRL Claim

Plaintiff complains, under the New York State analogue of the federal anti-discrimination statutes, that Defendants discriminated against him by "failing to provide a reasonable accommodation, taking adverse employment actions, disparate treatment, [and] creating and condoning a hostile work environment . . . ." (SAC ¶ 139). Defendants, in their moving papers, posit that the NYSHRL claim is "procedurally deficient" because Plaintiff failed to serve a notice of claim in accordance with N.Y. Pub. Auth. Law § 3316 before filing suit. (Def. Br. at 16-18).

Under applicable New York State law, "no action . . . shall be prosecuted or maintained against the corporation, its members, officers or employees for personal injury . . . tort or wrongful act . . . unless (a) a notice of claim shall have been made and served upon the corporation within the time limit set by and in compliance with section fifty-e of the general municipal law . . . ." N.Y. Pub. Auth. Law § 3316(1). As for the notice of claim's contents, it must "set forth," *inter alia*, "the nature of the claim." N.Y. Gen. Mun. Law § 50-e(2). "Any cause of action not directly or indirectly mentioned in the notice of claim may not be included in a subsequent lawsuit." *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110-11 (E.D.N.Y. 2011)

(quoting *Fincher v. Cty. of Westchester*, 979 F. Supp. 989, 1003 (S.D.N.Y. 1997)).  As one court

has explained:

> [t]he purpose of the statutory notice of claim requirement is to afford
> the public corporation an adequate opportunity to investigate . . . and
> to explore the merits of the claim while information is still readily
> available. The test of the notice's sufficiency is whether it includes
> information sufficient to enable the [municipal entity] to investigate
> the claim. In determining whether a claimant has complied with the
> statutory requirements for notice of claims, the court should focus
> on the purpose served by the notice of claim and whether, based on
> the claimant's description, municipal authorities can locate the
> place, fix the time and understand the nature of the accident.

*Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 87 (E.D.N.Y. 2012) (internal citations and

quotation marks omitted) (Bianco, J.). Bearing this guidance in mind, the question before the Court

is whether the NYSHRL claims are directly or indirectly mentioned in the Notice of Claim.

Prepared by counsel and signed by Plaintiff, the Notice of Claim read, in part, as follows:

> 3. The nature of the Claim:

> OSHA violations and its Whistleblower and its retaliation
> provisions; Violations of the Public Employee Safety and Health
> Law and its retaliation provisions; Violations of [t]he Americans
> with Disabilities Act and its retaliation provisions; Violations of the
> Rehabilitation Act and its retaliation provisions; Violation of the
> Family Medical Leave Act and its retaliation provisions;
> Defamation, Libel and Slander; Tortious Interference with
> Prospective Business Relations; Breach of Contract

(Not. of Claim at 2). Although the Notice of Claim did not identify the NYSHRL explicitly, it

identified the NYSHRL's federal analogues. *See, e.g.*, *Moore v. Verizon*, No. 13-CV-06467, 2016

WL 825001, at *5 (S.D.N.Y. Feb. 5, 2016). The Court concludes that, on these facts, the Notice

of Claim indirectly mentioned NYSHRL claims. *See, e.g.. Westbury Union Free Sch. Dist.*, 829 F.

Supp. 2d at 110 ("The fact that a cause of action not mentioned in a notice of claim arises out of

the same incident as enumerated claims is not pivotal; rather the nature of the claim and the theory

of liability are determinative." (internal quotation marks omitted)); *Barone v. Town of New Scotland*, 44 N.Y.S.3d 267, 268 (App. Div. 2016).

Defendants' motion to dismiss the NYSHRL claims because of Plaintiff's failure to file notice of claim in accordance with New York State law is denied.[18]

### B.   Defamation Claim

"In New York, '[d]efamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 41 (App. Div. 2014) (alteration in original)). Plaintiff, in order to state this claim, must allege: "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) (alteration in original, internal quotation marks omitted). "A defamation claim is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated." *Id.* (internal quotations omitted). Under Federal Rule of Civil Procedure 8, Plaintiff must "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763,

---

[18] Defendants' only argument in support of dismissing the NYSHRL claim is that it was not included in the Notice of Claim. (*See* Def. Br. at 3, 7, 16-18; Reply Br. at 10). The analysis is, therefore, limited to that issue. *See Keesh v. Quick*, No. 19-CV-08942, 2021 WL 639530, at *11 n.7 (S.D.N.Y. Feb. 17, 2021) ("[I]t is not this Court's responsibility to raise and make counsel's arguments for them." (quoting *Moore v. Peters*, 92 F. Supp. 3d 109, 126 (W.D.N.Y. 2015) (alteration in original)).

790 (S.D.N.Y. 2019) (citing *Neal v. Asta Funding, Inc.*, No. 13-CV-02176, 2014 WL 3887760, at

*3 (S.D.N.Y. June 17, 2014)).

In reciting this particular claim for relief, Plaintiff alleges that "Defendants" made five

particular statements in a May 12, 2020 letter. (SAC ¶ 151). Plaintiff identifies neither who made

the statements *nor* to whom they were made. (*See* SAC ¶ 151). The claim is, therefore, dismissed

on that basis. *See, e.g.*, *Kuczinski v. City of New York*, 352 F. Supp. 3d 314, 326 (S.D.N.Y. 2019)

("Failure to state the particular person or persons to whom the allegedly slanderous or libelous

comments were made as well as the time and manner in which the publications were made warrants

dismissal." (quoting *Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 153 (S.D.N.Y. 2016)); *Clachar-*

*Kimble v. MTA Long Is. R.R.*, No. 17-CV-07310, 2018 WL 3489576, at *3 (E.D.N.Y. July 19,

2018) ("Plaintiff's failure to identify the anonymous 'someone' is fatal to her claim."); *In Touch*

*Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 484 (S.D.N.Y. 2013) ("[I]t remains unclear

*who* . . . made such statements, *to whom* such statements were made, and *how* they were

communicated." (emphasis in original)), *aff'd*, 788 F.3d 98 (2d Cir. 2015); *Pure Power Boot*

*Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ("[A]

plaintiff must allege the time, place, and manner of the false statement and identify to whom the

false statement was made."); *Allstate Ins. Co. v. Batsiyan*, No. 05-CV-05933, 2008 WL 11434462,

at *7 (E.D.N.Y. Mar. 12, 2008) ("These allegations, with little to no reference to time, place or

speaker, are plainly too vague to constitute an adequate defamation claim."); *Camp Summit of*

*Summitville, Inc. v. Visinski*, No. 06-CV-04994, 2007 WL 1152894, at *12 (S.D.N.Y. Apr. 16,

2007) ("Defendant does not allege defamation with the requisite specificity. To wit, she neither

alleges who at Camp Summit made the defamatory remarks, nor to whom the comments were

made. Without these alleged facts, the claim cannot survive a motion to dismiss.").

Alternatively, even if Plaintiff pled a viable defamation claim, it appears that the statements were made to OSHA. (*Compare* SAC ¶ 151, *with* OSHA Resp.). The statements are, therefore, privileged. *See, e.g.*, *Arya v. Ensil Tech. Servs., Inc.*, No. 12-CV-00925, 2012 WL 6690326, at *4 (W.D.N.Y. Dec. 19, 2012) ("[T]he alleged defamatory statements were made in Ensil's response to Plaintiff's formal complaint of retaliation with the OSHA. Those statements are therefore subject to the absolute privilege that attaches to alleged defamatory statements made prior to, in the institution of, or during the course of, a proceeding." (internal quotation marks omitted)); *Allen v. St. Cabrini Nursing Home*, No. 00-CV-08558, 2001 WL 286788, at *6 (S.D.N.Y. Mar. 9, 2001) ("Statements submitted to administrative agencies are protected by absolute privilege."), *aff'd sub nom. Allen v. St. Cabrini Nursing Home Inc.*, 64 F. App'x 836 (2d Cir. 2003). This provides a second basis for dismissing the defamation claim, which the Court adopts.

The defamation claim is dismissed.

### C.  *Prima Facie* Tort Claim

Plaintiff's final claim for relief is one for *prima facie* tort. (SAC ¶¶ 155-62). "A claim for *prima facie* tort has four elements: '(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful.'" *Chidume*, 2020 WL 2131771, at *16 (quoting *Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 371-72 (W.D.N.Y. 2010)). This requires that Plaintiff "plead special damages and that the defendant was solely motivated by disinterested malevolence." *Miller v. City of Ithaca, New York*, No. 10-CV-00597, 2011 WL 13233263, at *9 (N.D.N.Y. Feb. 2, 2011).

With respect to damages, "actual losses must be identified and causally related to the alleged tortious act." *Massre v. Bibiyan*, No. 12-CV-06615, 2014 WL 2722849, at *11 (S.D.N.Y. June 16, 2014) (quoting *In Touch Concepts*, 949 F. Supp. 2d at 484 n.30); *see also Miller*, 2011

WL 13233263, at *9 ("Special damages in the context of a *prima facie* tort claim are actual temporal damages causally related to the alleged acts."). Plaintiff, however, merely invoked the phrase "special damages," referenced "increase[ed] . . . risk for sterility, cancer, and premature death" because of his exposure to radiation as an Endoscopy Unit nurse, and demanded "[c]ompensatory damages including, those for future pecuniary losses, emotion [sic] pain, suffering, mental anguish, punitive damages, and loss of enjoyment of life." (SAC ¶¶ 160-62). These unadorned, boilerplate allegations are insufficient, as a matter of law, to support a claim for *prima facie* tort under New York State law. *See Carlson*, 679 F. Supp. 2d at 372 ("Alleging merely general damages for noneconomic loss is insufficient." (internal quotation marks omitted)); *Reilly v. Natwest Mkts. Grp., Inc.*, 178 F. Supp. 2d 420, 429 (S.D.N.Y. 2001) ("[B]road and conclusory terms are simply insufficient to fulfill this critical element of the allegations necessary to sustain a cause of action to recover for *prima facie* tort." (quoting *Constant v. Hallmark Cards*, 568 N.Y.S.2d 441, 442 (App. Div. 1991)); *Gay v. Carlson*, No. 89-CV-04757, 1991 WL 190584, at *7 (S.D.N.Y. Sept. 17, 1991) ("The court finds that plaintiff's allegation that he lost his job due to the actions of defendants and that plaintiff made $127,000 a year . . . is insufficient to allow defendants to meet the claim and defend against it."); *see also Von Ludwig v. Schiano*, 258 N.Y.S.2d 661, 663 (App. Div. 1965) ("The failure to itemize special damages does not render a cause of action insufficient, except in special cases where such damages are essential to the cause of action, as, for example, in an action based upon *prima facie* tort." (internal citation omitted)). Plaintiff's claim for relief for *prima facie* tort is, consequently, dismissed.[19]

---

[19] Defendants also sought dismissal of the claim based on the sufficiency of the Notice of Claim. (*See* Def. Br. at 24). Given the conclusion on the substance, the Court need not and does not opine on this issue.

IV.    The Availability of Punitive Damages

The final issue for the Court's consideration is Defendants' argument that Plaintiff's request for punitive damages is "improper and must be dismissed as a matter of law." (Def. Br. at 24). In light of the holdings rendered herein, the Court agrees—punitive damages are not recoverable under the claims for relief that survive this motion and must be dismissed. *See, e.g.*, *Slominski v. NYS Off. of Mental Health*, No. 18-CV-00932, 2018 WL 6977339, at *4 (N.D.N.Y. Dec. 6, 2018), *adopted by* 2019 WL 121669 (N.D.N.Y. Jan. 7, 2019); *Scott v. ProClaim Am., Inc.*, No. 14-CV-06003, 2017 WL 1208437, at *13 (E.D.N.Y. Mar. 31, 2017) (explaining that punitive damages are not recoverable under the FMLA or NYSHRL).

## CONCLUSION

In light of the foregoing, Defendants' motion to dismiss is GRANTED IN PART. The third, fourth, sixth, seventh, eighth, and ninth claims for relief are dismissed. The first, second, and fifth claims for relief—that is, FMLA interference, FMLA retaliation, and the separate theories of liability pressed under the NYSHRL—shall proceed into discovery. No remaining claim for relief may seek punitive damages.

Defendants are directed to file an Answer to the Second Amended Complaint within twenty-one days of the date of this Memorandum Opinion and Order. The Court shall set an initial pretrial telephone conference shortly. The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 36.

**SO ORDERED:**

Dated:    White Plains, New York
          July 12, 2022

_____
PHILIP M. HALPERN
United States District Judge

35